**HMH PUBLISHING CO., Inc., a Delaware corporation, Plaintiff,**

v.

**Harold D. TURBYFILL et al., Defendants.**

No. 70–132–Civ–J.

United States District Court,
M. D. Florida,
Jacksonville Division.

Aug. 30, 1971.

Michael L. Shakman, R. Dickey Hamilton, Chicago, Ill., William H. Adams, III, Thomas M. Baumer, Jacksonville, Fla., for plaintiff.

W. Joe Sears, Jr., Jacksonville, Fla., for defendants.

## OPINION AND ORDER

CHARLES R. SCOTT, District Judge.

Plaintiff, HMH Publishing Co., Inc. (hereinafter "HMH") is a corporation organized and existing under the laws of the State of Delaware, with its principal offices and place of business in Chicago, Illinois. The individual defendants are resident citizens of the State of Florida and the corporate defendants were organized and exist under its laws. In addition to this diversity of citizenship between the parties and an amount in controversy exceeding $10,000 (28 U.S.C. § 1332), the Court's jurisdiction is invoked through a claim arising under the Lanham Act of 1946, 15 U.S.C. § 1051 et seq.

HMH brought this action to halt the defendants' use of the word "Playboy" in the names and advertising of their two Florida theaters, on grounds that such use constitutes unfair competition and infringes trade or service marks registered with the United States Patent Office. *See* 28 U.S.C. § 1338.

Undisputed evidence reveals the following sequence of events:

*1954*: The United States Patent Office issued certificate No. 600,018 to HMH for the trademark "Playboy" in connection with magazines.

*1964*: The United States Patent Office issued certificate No. 769,702 to HMH for the service mark "Playboy" in connection with establishments featuring food, drink and entertainment. Also, HMH opened its "Playboy Theater" in Chicago.

*1967*: Defendants opened the "Playboy Drive-In Theatre" in Jacksonville, Florida.

*1968*: Defendants opened the "Playboy Theatre" in Lake Worth, Florida.

*1969*: The United States Patent Office issued certificate No. 875,827 to HMH for the service mark "Playboy" in connection with theaters.

HMH bases its claim of trademark infringement upon 15 U.S.C. § 1114, which states in part:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, \* \* \* copy, or colorable imitation of a registered mark in connection with the sale \* \* \* or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; \* \* \*

shall be liable in a civil action by the registrant.

Standing alone, this Lanham Act provision could create problems of considerable scope for any established local or statewide business which suddenly found itself challenged by a federally-registered newcomer of similar name. To avoid such difficulties, Congress tempered § 1114 by providing that even where the right to use a registered mark had become "incontestable" under 15 U.S.C. § 1065, a defense to charges of infringement would lie where the defendant could show his mark

\* \* \* was adopted without knowledge of the registrant's prior use and has been continuously used \* \* \* from a date prior to registration of the mark \* \* \*. *Provided, however,* That this defense or defect shall apply only for the area in which such continuous prior use is proved. \* \* \* (15 U.S.C. § 1115(b) (5)).

Defendants take the position (1) that their use of "Playboy" for the theaters opened in 1967 and 1968 was without knowledge of a prior use of the word

*in like context* by HMH, and hence is superior to HMH's 1969 registration, and (2) that their adoption of the term was not connected with either magazines or "food and entertainment clubs," and therefore raised no "likelihood of confusion" with HMH's previous registrations (1954, 1964). The premise behind this latter contention is that if no actionable confusion existed when the theaters opened in 1967 and 1968, HMH may not now prevail by expanding into the theater business and thus generating such confusion.

■ The legal aspects of defendants' first line of argument appear sound. It seems clear that HMH's 1969 registration of "Playboy" in connection with theaters cannot by itself preempt rights to the word established prior to such registration. 15 U.S.C. § 1115(b) (5); Burger King of Florida, Inc. v. Hoots, 403 F.2d 904 (7th Cir., 1968). Their second argument, however, is equally vital to their case, and is considerably more complex.

■ It is well established that a *geographical* expansion by a business covered by a federally-registered mark is protected as against all later-registered (or unregistered) enterprises in the same field. Turner v. HMH Publishing Co., 380 F.2d 224 (5th Cir., 1967); John R. Thompson Co. v. Holloway, 366 F.2d 108 (5th Cir., 1966). Indeed, 15 U.S.C. § 1115(b) gives the registered party the "exclusive right to use" its "mark in commerce" to the exclusion of all conflicting marks. Defendants note, however, that it also explicitly limits this protection to uses of the mark "*in connection with the goods or services specified* in the affidavit filed [upon registration]." (Emphasis added.) Perhaps due in part to the broader language of § 1114, necessity has dictated that this restriction be construed to allow the registrant priority over *all* businesses, whether or not in direct competition, whose adoption of a similar mark (1) was subsequent to his own registration, and (2) created a likelihood of confusion

as to the source of the goods and services sold under the marks. *Turner, supra.* (Those whose adoption without notice *preceded* the plaintiff's registration have rights to the mark within their geographical area. § 1115(b) (5), *supra.*) This protection has been consistently extended as a shield for geographical expansion of a registered business, in plain recognition of the fact that

> [t]he language of the Federal Trademarks Act, as well as its legislative history, shows an intent to provide nationwide protection for expanding businesses. (John R. Thompson Co. v. Holloway, *supra,* at 114.)

■ Defendants argue, however, that regardless of the power of this shield in guiding a registrant's *geographical* expansion, its protection is lost when he enters a new *type* of business (as opposed to the same type in a new *location*). They suggest that a contrary ruling would complete the demise of meaning in the § 1115 restriction quoted above, and would allow opportunists to usurp well-established goodwill by barnstorming an old registration through any lucrative field where it would have seniority over similarly-named enterprises.

Assuming (without deciding) that defendants' arguments are correct, and given that their use of the "Playboy" mark has been continuous since 1967 and 1968, their sole task in prevailing over the infringement claim is to show that their original adoption of the mark violated no registered rights held by HMH. It is a presentation they cannot make.

■ On the basis of uncontroverted evidence submitted in affidavits, depositions, admissions, and answers to interrogatories, the Court is compelled to conclude that since its inception, defendants' use of "Playboy" has constituted a continuing infringement of the mark developed by HMH under its 1954 and 1964 registrations.

The facts show that in 1953, HMH began publishing *Playboy* magazine. Since that time it has (directly or through related companies) engaged in a wide va-

riety of other business activities under the same name—including a model agency, a book publishing division, a products sales division, and some television and film production work. The "Playboy Clubs," operating through a controlled license to a related company, are now located in fifteen major cities, and have been widely advertised through radio, magazines, and newspapers. The overall growth and success of HMH and its related businesses has been remarkable, and by the time defendants used "Playboy" on their first theater HMH's enterprises had broached $200 million in gross receipts. Even where appreciation of HMH's use of the mark has been somewhat varied, its notoriety has been universal. Neither Florida as a whole, nor the specific localities in which defendants operate their theaters, has been isolated from the effects of these promotional activities. Indeed, in 1961 a Playboy Club was opened in Miami amidst considerable publicity, and by 1967 had counted among its key-holding customers defendant Preston Henn, who initially suggested the name for the Jacksonville theater. There were 20,210 such keyholders in Florida as of 1967, and *Playboy* magazine had an in-state circulation above 92,000 by the summer of 1966. This included over 10,000 copies sold in the Jacksonville and Lake Worth areas in June of that year.

Defendants' often-repeated suggestion that the disparity between their services and those offered by HMH is so wide as to obviate any real likelihood of confusion is conclusively refuted by both evidence and judicially-privileged common sense. First, it is well settled that relief from trademark infringement is not predicated on a finding of direct competition between the products or services. 15 U.S.C. § 1114; Beef/Eater Restaurants, Inc. v. James Burrough Limited, 398 F.2d 637 (5th Cir., 1968); Turner, *supra*; American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619 (5th Cir., 1963). Competitive proximity is only an element to be considered in de-termining the basic question of likelihood of confusion. 15 U.S.C. § 1114; Continental Motors Corp. v. Continental Aviation Corp., 375 F.2d 857 (5th Cir., 1967).

Secondly, the commodities handled by the respective parties are in many ways similar; indeed, defendants' services could reasonably be expected to have come from HMH. Safeway Stores, Inc. v. Stephens, 281 F.Supp. 517 (W.D.La., 1967). Both parties brave the market place partially on the premise that sex sells, and HMH's well-known "Bunnies," "Playmates," and miscellaneous existentialists offer revelations at much the same speed and exposure as defendants' "X" and "R" rated films. Indeed, since 1964 HMH has operated and publicized its own "Playboy" theater in Chicago, the site of the first of its many clubs.

Whatever the exact degree of "direct" competition between the parties, it is clear that the defendants' use has occurred in an environment where the public is likely to be confused as to the source of the services. As noted above, high-profile national exposure had already lent a strong "secondary meaning" to the "Playboy" name by 1967. HMH had made extensive use of the "Playboy" mark in the Jacksonville and Lake Worth areas long before the defendants opened their theaters, and had established a strong association between that term and HMH enterprises. In such a skillfully saturated atmosphere, it is not surprising that the "likelihood of confusion" generated by defendants' entry has since yielded several instances of actual mistake:

1. The president of the corporation owning the Jacksonville theater has been asked on several occasions whether there was any connection between his theater and HMH. (Prior to the inception of this litigation, he himself wrote HMH inquiring about its possible interest in operating motion picture theaters.)

2. Film distributors have asked if the reason defendants' theaters didn't buy certain films was because their selections were dictated by HMH.

3.   A woman customer, apparently surprised to learn there was no connection between the parties, asked the manager of the Jacksonville theater why it was not associated with "Playboy" magazine and clubs.

 Defendants' final argument holds that in selecting a common English word for registration, HMH seated itself with a "weak" mark entitled to less protection than "strong" originals such as "Kodak" or "Coca-Cola." This distinction has little real vitality. Rather than defining absolutes, it only recognizes that there may be greater difficulty in establishing a "likelihood of confusion" as to some marks than as to others. Like the distinctions between "direct" and "indirect" competition, the uniqueness of a mark is "but one of the elements to be considered in determining whether confusion is likely to result." *Continental Motors, supra.* Nor do Miss Universe, Inc. v. Patricelli, 408 F.2d 506 (2d Cir., 1969), or Esquire, Inc. v. Esquire Slipper Mfg. Co., 243 F.2d 540 (1st Cir., 1957), cited by defendants, detract from this conclusion. In both of those cases, the defendant was required to maintain a distinctive, recognizable difference between his mark and that of the plaintiff.

It appears to the Court that plaintiff HMH has no adequate remedy at law, for unless defendants' present use of the "Playboy" mark is enjoined, the likelihood of confusion extant since their theaters opened will continue.

It is, therefore,

Ordered:

1.   Defendants' motion for summary judgment is denied.

2.   Plaintiff's motion for summary judgment is granted.

3.   The defendants, their directors, officers, agents, servants, employees, and successors and assigns, and all those in concert or participation with said persons or entities, and each of them, shall be permanently restrained and enjoined after the day of Thursday, September 16, 1971, from using, directly or indirectly, the trademark or service mark "Playboy" in connection with the operation of their businesses or any other businesses or future businesses whatsoever, or in connection with the advertising of such businesses.

4.   Plaintiff shall have and recover of and from the defendants its costs to be hereafter taxed.